IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TRACY L. BEIRD | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 17-5303 |
| LINCOLN UNIVERSITY OF THE | : | |
| COMMONWEALTH SYSTEM OF HIGHER | : | |
| EDUCATION | : | |

## MEMORANDUM

**SURRICK, J.**                                                                                    **SEPTEMBER 17, 2020**

Presently before the Court in this employment discrimination action is Defendant's Motion for Summary Judgment. (ECF No. 12.) For the following reasons, Defendant's Motion will be granted in part and denied in part.

**I.      BACKGROUND**

      **A.      Plaintiff Worked in Defendant's Office of Institutional Research**

Plaintiff began working for Defendant Lincoln University (the "University") as a senior secretary in October 2001. (Pl. Ex. 1.) In October of 2007, she accepted a position as assessment coordinator/data coordinator in Defendant's Office of Institutional Research. (Pl. Ex. 3; Plaintiff Dep. 63-64.) As assessment coordinator, Plaintiff collected and organized student census information and coordinated student evaluations of courses and professors. (Pl. Dep. 19, 68, 71, 83; Oikelome Dep. 33-34.)

From 2001 through 2012, Plaintiff reported to Dr. Renford Brevett, the Director of Institutional Research. (Pl. Ex. 3; Pl. Dep. 61.) When Dr. Brevett left the University at the end of 2012, Plaintiff began reporting to Catherine Rutledge, who had been the University Registrar and was appointed Interim Director of Institutional Research. (Pl. Dep. 79.) In July 2014, the

University hired a permanent director, Roxanne Foster, and Rutledge returned to her position as Registrar.  At that time, Plaintiff began reporting to Foster.  (*Id*. at 87; Foster Dep. 28.)  Beginning in January 2016, when Foster left the University, Plaintiff reported to Gloria Oikelome.  (*Id*.; Pl. Dep. 99.)  Oikelome served in various capacities at the University from January 2014 to May 2016, including Interim Director of Institutional Research, Director of Assessment and Accreditation, and Director of Institutional Effectiveness Research and Planning.  (Oikelome Dep. 11-12.)

In addition to the director and data coordinator, the Office of Institutional Research also employed a program analyst.  (Rutledge Dep. 52; Foster Dep. 21-24.)  Unlike the data coordinator, who pulled information from the University's database for various purposes, the program analyst modeled and interpreted the data, which required certain proficiencies in computer programming.  (Oikelome Dep. 33-35; Foster Dep. 27; Rutledge Dep. 62.)  Accordingly, Defendant required the program analyst, at a minimum, to have a bachelor's degree, and it preferred that the individual have a master's degree in "a business area, mathematics, computing, research design, statistics or a related field."  (Pl. Dep. Ex. 29.)

In July 2015, Plaintiff applied for the program analyst job, which was vacant at the time.  (Pl. Dep. 164,172; Foster Dep. 58.)  Although she did not have a bachelor's degree, when she was a senior secretary at the University, she sometimes "[a]ssist[ed] in the absence of the program analyst."  (Pl. Dep. 20; Pl. Ex. 12.)  In addition, when the program analyst position was vacant during Rutledge's tenure as Interim Director, Rutledge taught Plaintiff how to do some of the program analyst's tasks and Plaintiff handled some of the program analyst's responsibilities.  (Rutledge Dep. 57-60.; Pl. Dep. 82, 166-68.)  However, Plaintiff was not sure that she should apply for the program analyst position and she did not think that she would be given an interview.

(Pl. Dep. 164.)  However, Foster and Rutledge, both of whom were on the hiring committee for the position, encouraged Plaintiff to apply.  (*Id*. at 174; Foster Dep. 59-61.)

Foster was in charge of hiring for the position and offered an interview to Plaintiff and three or four other individuals.  (Foster Dep. 59-61.)  Foster, Rutledge, and Oikelome, the third member of the hiring committee, interviewed the candidates together and agreed that another candidate, LaThiza Crowelle ("Crowelle") was more qualified than Plaintiff.  (*Id*. at 61-62.)  At the time, Crowelle had a bachelor's degree in business administration and organizational leadership and was on her way to obtaining a master's degree in business.  (Def. Ex. H.)  Foster fired Crowelle after 30 days at the University because she was not a "good fit."  (Foster Dep. at 22.)

At her deposition, when she was asked if Plaintiff was qualified for the job, Foster said that she did not "know how to answer that."  (*Id*. at 59.)  She also testified that she "wanted a high-level analytical person because of the direction [they] were taking in trying to become more proactive in manipulating data."  (*Id*. at 61.)  According to Rutledge, Plaintiff was not qualified for the position because she did not have a degree and did not have all of the necessary data analytics skills for the job.  (Rutledge Dep. 60-62.)

    **B.**  **Plaintiff Took a Significant Amount of FMLA Leave to Care for Herself and Family**

Beginning around 2011, and until she was terminated on April 1, 2016, Plaintiff requested FMLA leave on a number of occasions to attend to her husband's, their two daughters', and her own health issues.  (Pl. Dep. 9, 77-78, 86-89, 98, 135-41; Def. Ex. F.)  For some issues, she used sick or vacation time instead.  (Pl. Dep. 93-94.)  With one exception, Plaintiff was never denied a request to take leave.  (*Id*. at 94-95.)  On the one occasion that she

was denied leave, she had requested a few days off to accompany her daughter to the Special Olympics held at Penn State. However, she could not take all of the requested days off because of a mandatory work training. (*Id*. at 95.) She was still able to attend some of the Special Olympics program. (*Id*. at 97.) Otherwise, none of her supervisors ever denied any of her requests for FMLA-protected leave. (*Id*. at 79, 86, 101-03, 141.) Defendant was aware of why Plaintiff frequently needed to take leave. (*See id*. at 85.)

Although Defendant almost always granted Plaintiff's requests for leave, the record indicates that her supervisors were not happy with her constant absences. For example, while Rutledge was Interim Director of Institutional Research, she believed Plaintiff's use of FMLA leave was "a problem" because it forced her to do "extra work." (Rutledge Dep. 55-56.) She even complained to the Vice President of Academic Affairs and told him she did not want to be Interim Director anymore because of her workload. (*Id*. at 56-57.) Rutledge acknowledges that one of the reasons that she made that statement was because she had to do Plaintiff's job when she was out on leave. (*Id*. at 57.)

In addition, in Plaintiff's June 2015 performance evaluation, Foster noted that Plaintiff could "be depended on to complete any assignment in advance of the deadline even though her health and unique family challenges may require her to take time off, or to work from home." (Pl. Ex. 11.) After Plaintiff's termination from the University, when she asked Foster to serve as a reference, Foster responded, "I am uncertain I would be the honest recommendation you might seek because I would need to speak to your attendance record." (Pl. Ex. 28.) In addition, when Plaintiff asked Foster about the reasons for her termination, one of the ways in which Foster responded was by sending Plaintiff a book entitled "The Essential Guide to Federal Employment Laws," the cover page of which specifically listed the primary federal employment laws,

4

including the ADA and FMLA.  (Pl. Ex. 29; Foster Dep. at 6.)  According to Foster, she sent that book to Plaintiff because she thought it may answer some of Plaintiff's questions.  (Foster Dep. 6.)[1]  Also according to Foster, around the fall of 2015, Oikelome made a comment to her "about the days [Plaintiff] was missing and how everybody has problems[ … Oikelome] had to take care of her parents and she still worked."  (Pl. Dep. 191-92.)

In February 2016, after Oikelome became Interim Director of Institutional Research, Plaintiff explained to Oikelome her family's health issues and why she needed time off.  Oikelome responded that "everybody had to be at work."  (*Id*. at 143-44.)  Around that time, Oikelome had another employee take over some of Plaintiff's responsibilities, such as the course evaluations.  (*Id*. at 227-28.)  Finally, when asked at her deposition if anything stands out about Plaintiff's tenure at the University, Oikelome responded, "I know from [Foster] and from the time that I briefly oversaw her in terms of when I had the interim director role and also per HR that there were times when she would have to take leave . . . ."  (Oikelome Dep. at 48.)

### C.     Defendant Terminated Plaintiff After Consolidating Two of Its Departments

In 2015, in response to some negative feedback from a university accrediting body, Defendant began considering merging the Office of Institutional Research and the Office of Assessment and Accreditation.  (Oikelome Dep. 70, 83.)  As part of those considerations, Oikelome was tasked with finding out how other institutions went about housing both of these roles in one office.  (*Id*. at 83-84.)  By early January 2016, Oikelome and others recognized that

---

[1] Defendant cites various out-of-circuit cases for the proposition that post-termination events are irrelevant to workplace retaliation and discrimination claims. (*See* Def. Reply 1-2, ECF No. 16.)  In so doing, Defendant fails to acknowledge the Third Circuit case law on the issue, which holds that post-termination comments may be probative of past managerial attitudes and discriminatory intent.  *See*, *e.g.*, *Ansell v. Green Acres Contracting Co., Inc.*, 347 F.3d 515, 524 (3d Cir. 2003); *Ryder v. Westinghouse Electric Corp.*, 128 F.3d 128, 133 (3d Cir. 1997).

as part of any consolidation, they may need to eliminate redundant positions between the two offices.  (*Id*. at 88-91.)  Among these overlapping positions were the directorships of the two departments, which would be combined into one position.  (*Id*. at 90.)  Also among the overlapping positions were the data coordinator and program analyst, which the consolidation team determined to merge into one "program analyst" position.  (*Id*. at 89.)  According to Oikelome, Plaintiff did not have the necessary skill set for this new position, which was meant for a "strong quantitative analytic person."  (*Id*. at 90, 152-53.)  No other positions were being combined or eliminated.  (*Id*. at 89-90 & Ex. 9.)

On January 14, 2016, the Interim Provost and Vice President of Academic Affairs notified Oikelome that the President of the University approved the planned reorganization and that Oikelome was being offered the position of Associate Vice President for Institutional Effectiveness.  (*Id*. at 108; Def. Ex. N.)  Dissatisfied with the compensation that she would receive for the new position, however, Oikelome informed the President in an email that she was "rescinding the request for merging the Office of Assessment & Accreditation with the Office of Institutional Research & Planning" and "declining the position of Associate Vice President for Institutional Effectiveness."  (Oikelome Dep. 126-27 & Ex. 7.)  In that same email, she wrote that "[i]t is also becoming apparent that attempts to replace an employee that has not contributed to the effective operation of the IR office is not supported due to concerns about what the employee may or may not do as it relates to Title III operations."  (*Id*. Ex. 7.)  When asked to clarify this statement, Oikelome explained that because some positions at the University were funded by Title III grants, there were concerns that the merger might jeopardize the grant money.  (*Id*. at 146-49.)  Oikelome also explained that she was referring to the data coordinator position in this email, but what she meant was that the position itself was not contributing to the Office of

Institutional Research, not that Plaintiff personally was not contributing to the office.  (*Id.* at 149-50.)  In her own words, she stated that "the position we had was not contributing and the employee who was in that position at that time happen[ed] to be Tracy Beird." (*Id.* at 150.)

Ultimately, in March 2016, the departmental merger was consummated, and the University approved the elimination of the Data Coordinator position.  (*Id.* Ex. 9.)  During an email exchange between various university administrators regarding cabinet approval of the merger, Oikelome noted, unsolicited, that cabinet approval was not necessary for the "termination of an employee." (*Id.*)  On March 23, 2016, Plaintiff was informed via letter dated March 21, 2016 that she was being terminated as a result of the merger, effective April 1, 2016.  (Pl. Dep. 200-01 & Ex. 38.)  Plaintiff acknowledges that she had been aware of the consolidation since October 2015.  (*Id.* at 11.)  She did not, however, know that she would be terminated.  (*Id.* at 157.)

Plaintiff's performance reviews indicate that from 2007 to 2015, she consistently exceeded expectations.  (Pl. Exs. 4-11.)

## II.   DISCUSSION

Plaintiff initiated this action on November 27, 2017, alleging: (1) interference and retaliation, in violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA") (Counts I and II); (2) discrimination, in violation of the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101 *et seq.* ("ADA"), and Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq.* ("PHRA") (Count III); retaliation, in violation of the ADA and PHRA (Count IV); (3) discrimination, in violation of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.* (Count V); and retaliation, also in violation of the Rehabilitation Act (Count VI).  (Compl., ECF

No. 1.) Defendant's Motion for Summary Judgment is ripe for our review.[2]

### A. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When making this determination, we must weigh all facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving party. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018). "For its part, '[t]he non-moving party must oppose the motion and, in doing so, may not rest upon the mere allegations or denials of his pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial. Bare assertions, conclusory allegations, or suspicions will not suffice.'" *Id.* at 288-89 (quoting *D.E. v. Central Dauphin Sch. Dist.*, 765 F.3d 260, 268-69 (3d Cir. 2014)). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 289 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Conversely, 'where a non-moving party fails sufficiently to establish the existence of an essential element of its case on which it bears the burden of proof at trial, there is not a genuine dispute with respect to a material fact and thus the moving party is entitled to judgment as a matter of law.'" *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016) (quoting *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014)).

### B. Plaintiff's FMLA Retaliation Claim May Proceed to Trial

Counts I and II of the Complaint allege both interference and retaliation. Count I addresses Plaintiff's rights with respect to caring for her family members, and Count II addresses

---

[2] In her response, Plaintiff consented to the dismissal with prejudice of Counts IV – VI of the Complaint, but that she opposed Defendant's Motion in all other respects. (ECF No. 14).

8

Plaintiff's rights with respect to caring for herself.  The legal standards are the same regardless of who receives the care. Therefore, we address these claims together.

"To establish a prima facie FMLA retaliation claim, a plaintiff must demonstrate that '(1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights.'"  *Neidigh v. Select Specialty Hospital-McKeesport*, 664 F. App'x 217, 223 n.12 (3d Cir. 2016) (quoting *Lichtenstein v. UPMC*, 691 F.3d 294, 301-02 (3d Cir. 2012)).  As in Title VII employment discrimination cases, if a plaintiff succeeds in establishing a *prima facie* case of FMLA-related retaliation, the employer "'must articulate a legitimate, nondiscriminatory reason for the adverse employment action.  The burden then shifts back to the plaintiff to prove, by a preponderance of the evidence, that the articulated reason was a mere pretext for discrimination.'"  *Capps v. Mondelez Global, LLC*, 847 F.3d 144, 152 (3d Cir. 2017) (quoting *Ross v. Gilhuly*, 755 F.3d 185, 193 (3d Cir. 2014)).

The only adverse employment action Plaintiff appears to offer for purposes of summary judgment is her termination.  (*See* Pl. Br. 2, 16, ECF No. 14.)  However, Defendant appears to concede that both the termination and refusal to hire Plaintiff for the program analyst position could be construed as adverse employment actions.  (Def. Br. 23, ECF No. 12-1.)  We consider both.

With regard to Plaintiff's burden of establishing a *prima facie* retaliation case, Defendant argues that Plaintiff cannot show causation.  "Whether a causal link exists 'must be considered with a careful eye to the specific facts and circumstances encountered.'"  *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 258 (3d Cir. 2014) (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 n.5 (3d Cir. 2000)).  "To demonstrate a causal connection, a plaintiff generally

must show 'either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link.'" *Id.* (quoting *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)). "In the absence of that proof the plaintiff must show that from the 'evidence gleaned from the record as a whole' the trier of the fact should infer causation." *DeFlaminis*, 480 F.3d at 267 (quoting *Farrell*, 206 F.3d at 281).

Defendant cites numerous cases in which courts granted summary judgment to employers on FMLA retaliation claims where, as here, the employer consistently approved the employee's requests for leave. *See*, *e.g.*, *Torres v. Cnty. of Berks*, No. 17-1890, 2018 WL 564406, at *9 (E.D. Pa. Jan. 26, 2018); *Calero v. Cardone Indus., Inc.*, No. 11-3192, 2012 WL 2547356, at *8 (E.D. Pa. June 29, 2012). However, in *Calero*, the court specifically indicated that although that kind of history is probative of a lack of causation, it "by no means establishes" a lack of causation between subsequent requests for FMLA leave and adverse employment action. *See id*. Plaintiff's situation is also distinguishable from that in *Calero*, where the plaintiff's manager told him on one occasion that "we all have issues … you can't miss any more time." 2012 WL 2547356, at *2. As the court explained, "[t]his isolated comment, although perhaps inappropriate, does not create a 'pattern' of antagonism or even evidence of antagonism standing alone…. Instead, it is akin to a 'stray remark, unconnected with and remote from the decision-making process'" leading to the adverse employment activity. *Id*. at *8 (quoting *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 333 (3d Cir. 1995)).

Here, by contrast, all three of Plaintiff's most recent supervisors at the University, who also happened to comprise the hiring committee for the program analyst position, made remarks implying or declaring that they were unhappy with Plaintiff's constant use of FMLA leave. That

is in stark contrast to the "isolated comment" in *Calero* or the *Torres* case cited by Defendant, where several coworkers were outwardly critical of the plaintiff for missing so much work, but none of those individuals were supervisory. 2018 WL 564406, at *4. Considered together, and viewed in the light most favorable to Plaintiff, Rutledge's, Foster's, and Oikelome's comments were not "stray" remarks, and they do give rise to an inference of causation.

Citing Plaintiff's lack of qualifications and the departmental merger, however, Defendant has met its "minimal burden" of establishing a legitimate, nondiscriminatory reason for passing over Plaintiff for the program analyst position and eventually terminating her. *See Lichtenstein*, 691 F.3d at 302. Therefore, the burden shifts back to Plaintiff to establish that her insufficient credentials and the merger were pretextual reasons for the adverse employment actions. To meet this burden, Plaintiff "'must point to some evidence, direct or circumstantial, from which a factfinder could reasonably … disbelieve [Defendant's] articulated legitimate reasons.'" *Id*. at 302 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). Plaintiff "'must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Defendant's] proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them 'unworthy of credence.''" *Id*. at 310 (quoting *Fuentes*, 32 F.3d at 765).

With regard to the program analyst position, the evidence is convincing that Plaintiff was not qualified for the job. Although she may have assisted with the program analyst's responsibilities from time to time, the fact remains that she did not have a college degree, which was a prerequisite for the position. Plaintiff also has not established that she had the requisite computer programming skills. Notwithstanding the fact that Foster and Rutledge encouraged Plaintiff to apply for the position, and that it was wrong to send Plaintiff after something that they knew she could not attain, their actions in this respect are not probative of any retaliatory animus.

11

Moreover, their actions have no other bearing on the plausibility of Defendant's legitimate reasons for the adverse employment actions against Plaintiff.

Plaintiff's termination, on the other hand, is not so clear cut.  Clearly, businesses have a right to eliminate positions, terminate employees, and engage in other measures to cut costs and streamline their internal processes.  However, the record indicates that Plaintiff was the only one terminated in connection with the merger.  The record also shows that Oikelome played a significant role in handling the staffing issues that arose from the merger, and that Oikelome had some animus towards Plaintiff because of her use of FMLA leave.  Indeed, Oikelome appeared to brush Plaintiff off when Plaintiff tried to explain why she needed so much leave and Oikelome also made comments to Foster that were critical and condescending towards Plaintiff, particularly with respect to her use of FMLA leave.  Finally, in the context of the entire email chain among Oikelome and other university leaders regarding cabinet approval of the merger, Oikelome's unsolicited email that cabinet approval was not needed for "termination of an employee" could be read to suggest that Oikelome was eager to terminate Plaintiff.  (*See* Oikelome Dep. Ex. 9.)  Until Oikelome sent that email, no one on the chain spoke in terms of terminating an employee.  Rather, they spoke in terms of "eliminating a position."  (*See id.*)

This is not to say that Defendant embarked on a complicated merger process solely as a justification for terminating Plaintiff.  However, a factfinder could reasonably conclude that during the merger process, Oikelome singled out Plaintiff for an improper reason. *See Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 180 (2d Cir. 2005) (finding genuine issues of material

fact existed as to whether merger was prextext for terminating employee). Summary judgment as to Plaintiff's retaliation claims will be denied.[3]

### C. Plaintiff's Interference Claim May Proceed to Trial

"An interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA." *Callison v. City of Philadelphia*, 430 F.3d 117, 120 (3d Cir. 2005). To succeed on an FMLA interference claim, "a plaintiff must establish: '(1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA.'" *Capps v. Mondelez Global, LLC*, 847 F.3d 144, 155 (3d Cir. 2017) (quoting *Ross*, 755 F.3d at 191-92). If an employee receives all of the benefits to which she is entitled under the FMLA, she cannot prevail on an interference claim. *Id.*; *Ross*, 755 F.3d at 192 ("[W]e have made it plain that, for an interference claim to be viable, the plaintiff must show that FMLA benefits were actually withheld.").

---

[3] The parties do not address the issue of whether Plaintiff would be able to defeat summary judgment under a "mixed-motive" theory of retaliation. Under a mixed motive theory a plaintiff may prevail if she "present[s] evidence 'from which a reasonable jury could conclude that [Defendant] had legitimate and illegitimate reasons for its employment decision and that [Plaintiff's] use of FMLA leave was a negative factor in the employment decision.'" *See Colonna v. UPMC Hamot*, No. 16-53, 2017 WL 4235937, at *8 n.2 (W.D. Pa. Sept. 25, 2017) (quoting *Egan v. Delaware River Port Auth.*, 851 F.3d 263, 275 (3d Cir. 2017)). The "mixed-motive" framework is "more lenient" than the "pretext" framework. *See id.*; *Lichtenstein*, 691 F.3d at 303. "The difference is in the degree of causation that must be shown: in a 'mixed-motive' case, the plaintiff must ultimately prove that her protected status was a 'motivating' factor, whereas in a non-mixed-motive or 'pretext' case, the plaintiff must ultimately prove that her status was a 'determinative' factor." *Colonna*, 2017 WL 4235937, at *8 n.2 (quoting *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 788 (3d Cir. 2016)).

Defendant appears to challenge only Plaintiff's showing on the fifth element of an interference claim. As Defendant points out, Plaintiff confirmed multiple times at her deposition that she was never denied FMLA benefits. In fact, she stated that "I don't believe the FMLA was interfered with." (Pl. Dep. at 231.) As Plaintiff notes, however, in some cases, terminating an employee for requesting FMLA leave may constitute both retaliation and interference. *See Capps*, 847 F.3d at 156 n.11 (recognizing that a claim for termination-based interference may lie where "the employee 'requested FMLA leave but was fired before the leave was scheduled to begin,' i.e., before the employee actually took the leave") (citing *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 509 (3d Cir. 2009)).

Given the lack of case law on this type of interference claim, the questions of the relevant standards and Plaintiff's burden of proof are problematic. *Cf. DeCicco v. Mid-Atlantic Healthcare, LLC*, 275 F. Supp. 3d 546, 563 (E.D. Pa. 2017) ("[T]he precise circumstances under which a plaintiff may advance both retaliation and interference claims is not entirely clear."). Some courts have allowed interference claims to survive summary judgment solely on the basis of termination during FMLA-covered leave. *See*, *e.g.*, *Kohler v. TE Wire & Cable LLC*, No. 14-3200, 2016 WL 885045, at *10 (D.N.J. Mar. 8, 2016). However, we question whether terminating an employee who is currently using or about to use FMLA leave can be actionable in all circumstances. If that were the case, an FMLA-bound employee could never be terminated, even for a perfectly legitimate reason.

Several courts have to read a temporal causation element into this type of interference claim. *See*, *e.g.*, *Phillips v. Great Dane, LLC*, No. 18-401, 2019 WL 2448320, at *3 (M.D. Pa. June 12, 2019) (denying summary judgment where employee was terminated "*within a short time*" of notifying employer of medical issues and "before he could use FMLA leave") (emphasis

14

added); *Detwiler v. Clark Metal Prods. Co.*, No. 08-1099, 2010 WL 1491325, at *17 (W.D. Pa. Mar. 19, 2010) (denying summary judgment where employee was terminated "*within days*" of notifying employer of need to take additional FMLA leave) (emphasis added).  Even then, however, employers could still face liability for engaging in legitimate employment actions.

We join our colleague's opinion in *DeCicco* in concluding that without clear guidance from the Third Circuit on the contours of a termination-based interference claim, we should be hesitant to dismiss an interference claim on summary judgment where a plaintiff's termination "resulted in benefits being withheld." *See* 275 F. Supp. 3d at 564.  Nevertheless, we still must decide whether Plaintiff's termination prevented her from availing herself of FMLA benefits to which she was entitled.  Based on the record, we conclude that it did.

On October 8, 2015, Plaintiff requested FMLA leave to care for her daughter.  (Pl. Ex. 21.)  As of November 3, 2015, several months before the elimination of Plaintiff's position was approved, Plaintiff was approved for intermittent FMLA leave from October 5, 2015 through April 4, 2016.  (Pl. Ex. 23.)  As of March 22, 2016, that leave had been extended through September 20, 2016.  (Pl. Ex. 23.)  From February to March 2016, Plaintiff was on FMLA leave for multiple days.  (Pl. Dep. 135-36 & Ex. 17.)  On March 15, 2016, Plaintiff requested additional leave to care for her husband.  (Pl. Ex. 26.)  She had also been approved for leave from March 1, 2016 through May 16, 2016, apparently in relation to her other child.  (Pl. Dep. 98 & Ex. 9.)  Around that time, Plaintiff had close to 300 hours of FMLA leave remaining.  (Pl. Ex. 25.)

Giving Plaintiff the benefit of all reasonable inferences, one could conclude that Plaintiff would have taken additional time off under the FMLA after her April 1, 2016 termination.  She has thus raised a genuine issue of material fact as to whether her termination on April 1, 2016 interfered with her FMLA benefits.  Summary judgment will be denied as to Counts I and II.

15

D.      **Plaintiff's Disability Discrimination Claim Will Be Dismissed**[4]

Plaintiff asserts that based on Oikelome's disparaging remarks and conduct in restructuring the Office of Institutional Research, a jury could conclude that Defendant "terminated her because of her association with her disabled family members." (Pl. Br. at 20, ECF No. 14.) Although Plaintiff appears to abandon any claims based on her own alleged disabilities, we will determine whether she could proceed on that basis also.

Typically, "[t]o establish a prima facie case under the ADA, a plaintiff must show that [s]he (1) has a disability; (2) is a qualified individual; and (3) has suffered an adverse employment action because of that disability." *Stouch v. Twp. of Irvington*, 354 F. App'x 660, 666 (3d Cir. 2009) (citing *Turner v. Hershey Chocolate USA*, 440 F.3d 604, 611 (3d Cir. 2006)). However, the ADA includes an "association" provision, which extends discrimination to "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). To establish a *prima facie* case of discrimination under an associational theory, the plaintiff must show that the employer "was motivated by [the relative's] disability rather than by [the plaintiff's] stated intention to miss work; in other words, that she would not have been fired if she had requested time off for a different reason." *Erdman*, 582 F.3d at 510 (citing *Den Hartog v. Wasatch Academy*, 129 F.3d

---

[4] Before the passage of the ADA Amendments Act of 2008 (the "ADAAA"), courts unanimously considered the ADA and PHRA coextensively. *See Gardner v. SEPTA*, 410 F. Supp. 3d 723, 734 n.5 (E.D. Pa. 2019). However, because the ADAAA relaxed the definition of disability, some courts have since considered ADA and PHRA claims separately. *See, e.g.*, *Rubano v. Farrell Area Sch. Dist.*, 991 F. Supp. 2d 678, 689 n.7 (W.D. Pa. 2014). Here, because our decision does not depend on the definition of disability, we consider the ADA and PHRA claims together. *See Jeffrey v. Thomas Jefferson Univ. Hosp., Inc.*, No. 17-0531, 2019 WL 2122989, at *9 n.6 (E.D. Pa. May 14, 2019).

1076, 1085 (10th Cir. 1997) (requiring association provision plaintiffs to show that an "adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision")). The Third Circuit allows associational discrimination claims to proceed if the employee was "fired because her employer feared that she *might* miss work to care for a disabled relative even though she had not taken or requested time off." *See id*. (emphasis in original). In permitting such claims, the Third Circuit reasons that "a decision motivated by unfounded stereotypes or assumptions about the need to care for a disabled person may be fairly construed as 'because of the … disability' itself." *Id*. at 511 (quoting 42 U.S.C. § 12112(b)(4)).

In all ADA discrimination cases, "[o]nce a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Stouch*, 354 F. App'x at 666 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973)). "The plaintiff then bears the burden of establishing that this proffered reason is a pretext for discrimination." *Id*.; *Walton v. Mental health Ass'n of Southeastern Pennsylvania*, 168 F.3d 661, 667-68 (3d Cir. 1999)).

Here, Plaintiff fails to establish the causation element of her *prima facie* case. There is no evidence suggesting that Defendant terminated Plaintiff because of her or her relatives' disability. Plaintiff reiterates the arguments she made in support of her FMLA claims, i.e., the departmental consolidation and Oikelome's "disparaging comments about *the time off Beird was taking* and planned to take because of her disabled family members." (Pl. Br. at 20, ECF No. 14) (emphasis added). However, if Defendant was singling Plaintiff out for her time off, rather than for her or her family members' disabilities, the proper claim is one for FMLA retaliation, not associational disability discrimination. *See Erdman*, 582 F.3d at 510 & n.6. Indeed, Defendant knew about

Plaintiff's and her family member's health issues for years before Plaintiff was terminated. Accordingly, "[t]he most [Plaintiff] can hope to show is that she was fired for requesting time off to care for [her family] (the basis for her FMLA claim), not because of unfounded stereotypes or assumptions on [Defnedant's] part about care required by disabled persons." *Id*. at 511.

Summary judgement will be entered in favor of Defendant as to Count III of the Complaint.

### III.  CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment will be granted in part and denied in part.

An appropriate order follows.

                **BY THE COURT:**

                */s/ R. Barclay Surrick*
                **R. BARCLAY SURRICK, J.**